MUNICIPAL FUNDING, LLC *v.* ZONING BOARD OF APPEALS OF THE CITY OF WATERBURY ET AL.
(AC 21757)

Lavery, C. J., and Foti and Dranginis, Js.

Argued April 30 and September 12—officially released December 17, 2002

*Franklin G. Pilicy,* for the appellant (plaintiff).

*Charles E. Oman III* and *Elaine M. Skoronski,* with whom, on the brief, was *Jayne Elser Welch,* for the appellees (defendants).

*Opinion*

DRANGINIS, J. The plaintiff, Municipal Funding, LLC, the owner of real property in Waterbury, appeals from the judgment of the trial court dismissing its appeal from the decision of the defendant zoning board of appeals of the city of Waterbury (board),[1] which denied the plaintiff's application for a special exception. The plaintiff, in essence, contends that the court improperly concluded that the board possesses the discretion to deny an application for a special exception on the basis of concern for public safety, when the record lacks any evidence to support such a finding.[2] We agree with the plaintiff and reverse the judgment of the trial court.

The following facts are pertinent to our resolution of the plaintiff's appeal. The plaintiff owns real property at 300 Schraffts Drive, which is in the R.M. moderate density residence district (R.M.) and C.A. commercial artery district (C.A.) as defined by the Waterbury zoning regulations (regulations). The plaintiff filed an applica-

___

[1] Also named as defendants were Joseph Caiazzo, the board's chairman, and Cassandra McDaniel Pender, the city clerk of the city of Waterbury.

[2] The plaintiff raises the following two issues in its brief, which we deem to be the same claim: "I. Did the trial court err in concluding that the [board] has the discretion to deny a special permit on general grounds of public safety and welfare when there is no evidence in the record to support a public safety concern?

"II. Did the trial court err in concluding that the [board] has the unlimited discretion to deny a special permit on the basis of speculation or perception only as to a possible public safety concern?"

tion to the board for a special exception to open a convalescent, rest or nursing home on the property pursuant to § 5.13-13 of the regulations.[3] Specifically, in its application, the plaintiff proposed to utilize the property as a long-term, drug free residential treatment facility for adolescents and young adults with substance abuse problems. The proposed facility would be operated by the APT Foundation (foundation), an affiliate of the Yale School of Medicine, and licensed by the department of public health and the department of children and families.

A public hearing on the plaintiff's application ensued. At the hearing, the following evidence was adduced. The foundation intended to utilize the facility as a long-term, drug free residential treatment facility providing educational, vocational and clinical services to approximately 125 adolescents and young adults with severe substance abuse or dependence problems. Most residents of the facility would be referred to the foundation by various state agencies, school systems and the department of correction and generally would remain in the program from six months to two years.

During the hearing, Allen Brown, the chief executive officer of the foundation, and Samuel Ball, the foundation's director of residential services and an associate professor of psychiatry at Yale Medical School, spoke on behalf of granting the special exception. Brown testified that the foundation, a nonprofit organization that is an affiliate of the Yale School of Medicine, has been in existence since 1968 and has operated the identical program in Newtown for the past fifteen years. Brown stated that the program in Newtown has been very

---

[3] Section 5.13-13 of the Waterbury zoning regulations provides in relevant part: "Convalescent homes, rest homes, and nursing homes may be a permitted use in the R.M., R.H. [high density residence] and C.A. districts, subject to a public hearing [and] approval of a special exception by the zoning board of appeals . . . ."

successful for the past fifteen years, but due to the state's acquisition of the property, the foundation was forced to find a new location in which to operate the facility.[4]

The proposed facility would have a ratio of two residents per one staff worker. The residents would not be permitted to have automobiles, and, although the facility would not be locked, the residents would not be permitted to leave the premises freely. Brown further stated that in the thirty years of operating similar programs, rarely has a resident ever left the facility, but that the few who have wandered away simply return to their respective homes. With respect to the security of the facility, Brown stated that the staff monitors all movement within the building, but the foundation does not employ a special security force. In the thirty years that the foundation has operated similar programs, it has had very few problems with neighbors. The foundation also will not accept violent offenders or sex offenders into its program. He further stated that "[a]ddiction is a medical infirmity . . . equivalent to having diabetes or hypertension or heart disease." Remaining drug free also is a prerequisite to participation in the program. Residents in the facility would be subjected to random drug tests and would be discharged immediately from the program if the result is positive.

Ball explained that the proposed facility would house fifty staff members, comprised of two physicians, two clinical psychologists, four social workers, four social workers with master's degrees, four nurses, a vocational counselor and various residential counselors. Ball added that "addiction is a physical disorder . . . because the brain is altered as a function of [drug abuse] . . . [and] that does not go away immediately with the cessation of drugs or alcohol use . . . ."

---

[4] The state apparently notified the foundation that it had to vacate the Newtown facility due to private redevelopment plans.

Opponents to the granting of the special exception also spoke at the public hearing. Several residents, who live in neighborhoods near the proposed facility, expressed their concerns about neighborhood safety, particularly because many people often walk at night. Another person, who owns a business in the vicinity, stated that he feared that the opening of a drug treatment facility would decrease the property rental values in the area. After hearing all of the testimony, the board unanimously voted, with one abstention, to deny the plaintiff's application.

The plaintiff subsequently appealed from the board's decision to the trial court pursuant to General Statutes § 8-8. Dismissing the plaintiff's appeal, the court concluded that "a review of the record shows that the board had 'substantial evidence' to sustain its denial of the special exception application," and therefore that it could not "say that the board acted arbitrarily . . . ." This appeal followed.

As previously set forth, on appeal to this court, the plaintiff contends that the trial court improperly concluded that the board possesses the discretion to deny a special exception application on the ground of public safety when insufficient evidence exists in the record to support such a finding.[5] Although the plaintiff frames the issue around the board's discretion, the gravamen of the claim is evidentiary in nature. In essence, the plaintiff argues that because the record lacks any evidence of actual public safety concerns, the board acted arbitrarily and in abuse of its discretion in denying the application. Therefore, the plaintiff urges, the court's

---

[5] We read the plaintiff's claim to be that the board exceeded its discretion and not that the board lacks any discretion to determine whether to grant a special exception, as the defendant suggests. To the extent that the plaintiff intended to make such an argument, however, as will be explained, we reject the notion that the board lacked any discretion in the matter.

dismissal of the matter was clearly erroneous and warrants our reversal. We are so persuaded.

We first set forth the appropriate standard of review. Whether a zoning board grants a special exception, also known as a special permit,[6] essentially is a discretionary process. *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 626, 711 A.2d 675 (1998). "The basic rationale for the special permit . . . is that while certain land uses may be generally compatible with the uses permitted as of right in a particular zoning district, their nature is such that their precise location and mode of operation must be individually regulated because of the particular topography, traffic problems, neighboring uses, etc., of the site." (Internal quotation marks omitted.) *Whisper Wind Development Corp.* v. *Planning & Zoning Commission*, 32 Conn. App. 515, 519, 630 A.2d 108 (1993), aff'd, 229 Conn. 176, 640 A.2d 100 (1994). A special permit enables a property owner to utilize the property in a manner expressly allowed by the local zoning regulations, subject, of course, to satisfying the standards set forth in the regulations. *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission*, 46 Conn. App. 566, 569, 700 A.2d 67, cert. denied, 243 Conn. 935, 702 A.2d 640 (1997). Moreover, "considerations such as public health, safety and welfare, which are enumerated in zoning regulations, may [also] be the basis for the denial of a special permit." *Irwin* v. *Planning & Zoning Commission*, supra, 627.

"When ruling upon an application for a special [exception], a planning and zoning board acts in an administrative capacity. . . . Generally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of

---

[6] A special exception and a special permit are synonymous terms and may be used interchangeably. *Grasso* v. *Zoning Board of Appeals*, 69 Conn. App. 230, 242 n.7, 794 A.2d 1016 (2002).

[its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The [Appellate Court and] trial court [must] decide whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . . In applying the law to the facts of a particular case, the board is endowed with a liberal discretion, and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." (Citations omitted; internal quotation marks omitted.) Id., 627–28. Although a zoning commission or board possesses the discretion to determine *whether* a proposal meets the standards established in the regulations, it lacks the discretion to deny a special permit if a proposal satisfies the regulations and statutes. Id., 628.

"[C]ourts are not to substitute their judgment for that of the board, and . . . the decisions of local boards will not be disturbed as long as honest judgment has been reasonably and fairly made after a full hearing . . . . The trial court's function is to determine on the basis of the record whether substantial evidence has been presented to the board to support [the board's] findings. . . . [E]vidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . Where the board states its reasons on the record we look no further. . . . Where, however, the board has not articulated the reasons for its actions, the court must search the entire record to find a basis for the board's decision. . . . More specifically, the trial court must determine whether the board has acted fairly or with proper motives or upon valid reasons. . . . We, in turn, must determine whether the court properly concluded that the board's decision to [deny the application for a special permit] was arbitrary, illegal or an abuse of discretion." (Citations omitted; internal quota-

tion marks omitted.) *Stancuna* v. *Zoning Board of Appeals*, 66 Conn. App. 565, 567–68, 785 A.2d 601 (2001). "The evidence, however, to support any such [decision] must be substantial . . . ." (Internal quotation marks omitted.) *Quality Sand & Gravel, Inc.* v. *Planning & Zoning Commission*, 55 Conn. App. 533, 540, 738 A.2d 1157 (1999); see also 1 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) § 61f.

Before analyzing the merits of the plaintiff's claim, we first must set forth the applicable zoning regulations and statutes that formed the basis of the board's decision. Section 5.13-13 of the regulations provides in relevant part that "[c]onvalescent homes, rest homes, and nursing homes may be a permitted use in the R.M., R.H. [high density residence] and C.A. districts," subject to a public hearing approval of a special exception by the board of appeals.[7] General Statutes § 8-2 (a) further provides that zoning regulations "may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a . . . zoning board of appeals . . . subject to standards set forth in the regulations and *to conditions necessary to protect the public health, safety, convenience and property values* . . . ." (Emphasis added.) Article I, § 1.1, of the regulations reiterates the goal of protecting public safety, health and welfare. Moreover, § 7.24 of the regulations requires all of the board's actions to be "made in accordance with the Connecticut General Statutes . . . and in harmony with the purpose and intent expressed in Article I, section 1.1 hereof."

The parties do not dispute whether the plaintiff's proposal satisfied the physical requirements of § 5.13-

[7] Section 5.13-13 of the Waterbury zoning regulations provides further requires the proposed convalescent home, rest home or nursing home to meet certain standards with respect to occupancy, parking, size, location and placement of the facility on the property itself. It appears, and the parties do not dispute, that the plaintiff's proposal meets all of those conditions.

13, nor do they contest the classification of the facility as a convalescent, rest or nursing home. As the court noted, the board did not formally state its reasons for denying the plaintiff's application for a special exception. Accordingly, the court thoroughly reviewed the record to ascertain the reasoning behind the board's decision. The court's memorandum of decision, and our own review of the record, evinces that the board denied the plaintiff's application on the basis of its concern for public safety. Thus, the issue here is whether the board acted arbitrarily and in abuse of its discretion when it denied the plaintiff's application for a special exception on the basis of concern for public safety.

On the basis of our review of the record, we conclude that the board acted arbitrarily in denying the plaintiff's application. There was no evidence or testimony presented to the board to warrant a finding that this *particular* proposed facility posed a threat to public safety. As the court stated, Brown testified that the facility is not locked and that the program does not permit residents to keep automobiles on the property. Brown further stated, however, that in thirty years of running similar programs, residents rarely have wandered away, and the few who have left return to their own homes and do not go into the surrounding neighborhoods. Since the inception of the program, there have been few, if any, security or safety issues. The program was run with such success in Newtown that it received special recognition from that town. Moreover, those who have committed either violent or sex crimes are not admitted into the program. Abstinence from all substances also is a prerequisite to entering the facility, and those who relapse, or fail a randomly administered drug test are ejected immediately.

Although several residents from the area spoke against the granting of the permit, they solely voiced their own personal views and fears. As the court stated,

"[r]esidents testified that there is a *perception* that the proposed facility will be unsafe for the neighborhood . . . ." (Emphasis added.) None of the opponents, however, presented any factual evidence or data to demonstrate how the proposed facility would threaten their safety or lower property values. For example, there was no evidence presented to the board, from expert or lay witnesses, regarding safety breaches at the foundation's other facilities, problems that the foundation has had with residents, any nuisances that the program has caused in other neighborhoods, or that the prospective residents themselves would be dangerous. Although we acknowledge the concerns voiced by the neighbors, it was unreasonable and arbitrary for the board to deny the special exception on the basis of those unsubstantiated, personal statements made by people without any prior knowledge of or experience with the proposed facility.

In dismissing the plaintiff's appeal, the court also appears to have relied on the plaintiff's testimony regarding the fact that the facility would be unlocked and that a security force would not be employed. We conclude that those two bare facts, without more, are insufficient to support a finding that the proposed facility would compromise public safety. Given the plaintiff's testimony that it operated an identical program in Newtown for the past fifteen years with very few, if any, incidents, we fail to discern how the plaintiff's statements constituted proof of a threat to public safety. Moreover, neither the plaintiff nor its opponents presented to the board any specific examples or prior situations of security breaches linking the lack of locks and a security force to public safety concerns. To the contrary, the fact that there have been relatively few, if any, problems in Newtown, a facility that was unlocked and without a security force, demonstrates that the proposed facility does not pose a threat to public safety.

We further note that there have been no incidents where a resident has wandered into the surrounding communities.

We therefore conclude that there is no evidence in the record of any actual or reasonable public safety concerns. Accordingly, because the substantial evidence in the record does not support the board's reason for denying the plaintiff's application for a special exception, the board's decision was unreasonable and arbitrary. The court thus improperly dismissed the plaintiff's appeal.

The judgment is reversed and the case is remanded with direction to render judgment sustaining the plaintiff's appeal.

In this opinion the other judges concurred.