[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by plaintiff Savin Gasoline Properties, LLC from the action of the defendant Town of Lisbon Planning and Zoning Commission (hereinafter the Commission) granting the application of defendant Hendel's Shell Stations, LLC (hereinafter Hendel's) application for a special permit for property at 114 River Road (Route 12) in the Town of Lisbon.
For reasons hereinafter stated, the action of the Commission in granting the application for a special permit, is affirmed.
Plaintiff has instituted this appeal under the provisions of Connecticut General Statutes §§ 8-9 and 8-8b. Section 8-8b limits appeals to persons aggrieved by the decision appealed from. Pleading and proof of aggrievement are essential to establish subject matter jurisdiction over an appeal. Jolly, Inc. v. Zoning Board of Appeals,237 Conn. 184, 192 (1996). The question of aggrievement is essentially one of standing. McNally v. Zoning Commission, 225 Conn. 1, 5-6 (1993).
Two broad yet distinct categories of aggrievement exist, classical and statutory. Lewis v. Planning Zoning Commission, 62 Conn. App. 284,288 (2001). Statutory aggrievement exists by legislative fiat. In cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation. Colev. Planning Zoning Commission, 30 Conn. App. 511, 514-15 (1993). Connecticut General Statutes § 8-8 (a) (1) provides that "aggrieved person" includes any person owning land that abuts or is within a radius of 100 feet of any portion of the land involved in the decision of the board. The evidence indicates that plaintiff acquired title to property on River Road on September 26th, 2000 and continues to hold title to such property. This property lies within 100 feet of the property which is the subject of the special permit. It is therefore found that plaintiff is statutorily aggrieved and has standing to prosecute this action.
The record indicates that on August 29, 2001, Hendel's filed with the CT Page 874 Commission an application for a special permit, as required by § 5.2 of the Lisbon Zoning Regulations, for its property at 114 River Road. The proposed use, as stated in the application, was "fuel service station with an internal retail element ("Henny Penny") and a restaurant ("Dunkin Donuts") with a drive-thru window."
The Commission held public hearings on the application on October 9, 2001 and November 7, 2001 at which parties were given an opportunity to be heard. On December 4, 2001, the Commission granted the special permit application without stating its reasons on the record.
Within the time allowed by statute, plaintiff instituted the present appeal.
No questions have been raised concerning jurisdictional issues. All required notices appear to have been properly published and no jurisdictional defects have been noted.
Here, the Commission was asked to grant a special permit. When ruling upon an application for a special permit. the Commission was acting in its administrative capacity. A.P. W. Holding Corporation v. Planning Zoning Board, 167 Conn. 182, 184-85 (1974). A special permit allows a property owner to use his property in a manner expressly permitted by the zoning regulations. Id. In deciding whether or not to grant a special permit, it is the function of the Commission to decide within prescribed limits and consistent with the exercise of its legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does appear. The trial court must then decide whether the Board correctly interpreted the section of the regulations and applied it with reasonable discretion to the facts. Irwinv. Planning Zoning Commission, 244 Conn. 619, 627-28 (1998). In applying the law to the facts of a particular case, the Board is endowed with liberal discretion and its action is subject to review by the Court only to determine whether it was unreasonable, arbitrary or illegal.Municipal Funding, LLC v. Zoning Board of Appeals, 74 Conn. App. 155, 161
(2002).
A proposed use as set forth in the application for special permit must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values. Connecticut General Statutes § 8-2. Acting in its administrative capacity, the Board's function is to determine whether the applicant's proposed use is expressly permitted under the regulations and whether the standards set forth in the regulations and the statute are satisfied. A.P. W. HoldingCT Page 875Corporation v. Planning Zoning Board, supra, 167 Conn. 184.
In granting the special permit, the Board gave no reasons for its action. Where the Board fails to state reasons for its action, the trial court must search the record to find a basis for the action taken. Ziekyv. Town Plan Zoning Commission, 151 Conn. 265, 268 (1963).
There is an existing gasoline service station on the property which is the subject of the application. By its application, Hendel's proposes to demolish the existing facility and replace it with a full-service station with a retail element and a restaurant with drive-thru window. The property is located in the BV-1 business village district. Retail sale of gasoline and multiple commercial uses are allowed in the BV-1 district by § 5.2 of the regulations, but require a special permit. The issuance of special permits is covered by § 11 of the regulations.
Plaintiff claims that in granting the special permit to Hendel's, the Commission failed to comply with its own regulations. In support of this claim, plaintiff has raised a number of specific allegations each of which will have to be assessed separately.
The court is not bound to consider any claim not briefed. Shaw v.Planning Commission, 5 Conn. App. 520, 525 (1985); Moulton Brothers,Inc. v. Lemieux, 74 Conn. App. 357, 363 (2002).
 I.
The most significant claim raised by plaintiff is that Hendel's proposal for the disposition of sanitary waste fails to comply with the provisions of the zoning regulations and the Connecticut Public Health Code.
Section 11.1.1 of the zoning regulations requires that a proposed special use "[b]e arranged and constructed in a manner that protects the health, safety and welfare of the citizens of Lisbon. " Plaintiff claims that the proposed special use application fails to comply with § 11.3 of the regulations which is entitled "appropriateness of use." This section provides that "[t]he proposed use shall be appropriate for the designated location with regard to . . . sewage. . . ." This section of the regulations also requires that a proposed special use "[b]e arranged and constructed in a manner that protects the health, safety and welfare of the citizens of Lisbon. "
The record indicates that a sewer line has been installed along Route 12 adjacent to the proposed special use site. The map submitted with the CT Page 876 application indicates that the property will be connected to an existing stub on this sewer line. This sewer line, however, is not a part of any municipal system, but is privately owned, having been installed by a nearby developer.
It is reasonable to conclude from the record that the parties anticipate that the sewer line will eventually be turned over to the town to become part of a municipal system. Plaintiff correctly points out, however, that no firm date has been set for any municipal takeover and the sewer line has not been accepted for use by the selectman acting as the Water Pollution Control Authority.
The application provides for an interim sanitary sewer system pending the proposed hookup to the sewer line. The interim plan calls for the discharge of sewage into a planned 1,000 gallon grease trap. This would require the removal of the effluent by pumping every two or three days with discharge into a licensed facility. Plaintiff claims that the Commission could not approve the special permit conditioned upon the future availability of public sewers and the proposed interim solution was not authorized under the state public health code. It is plaintiffs claim that under state regulations only public sewers, or onsite disposal subsurface systems are allowable. Any system utilizing a holding tank with periodic pumping will require specific approval of the Commissioner of Health Services. The "Design Manual Subsurface Sewage Disposal System For Household And Small Commercial Buildings," published by the Department of Health and returned to court as a part of the record, states that a holding tank may be used as an interim measure while public sewers are under construction. The same regulation requires that a holding tank shall not be installed without approval of the state Department of Health and the local director of health.
It is plaintiffs claim that the Commission had no authority to approve the special permit application as presented. Plaintiff claims that the present ability to hook up to a municipal sewer line or state approval of the holding tank system were preconditions to any valid approval of the special permit.
Section 11.1.1 requires the Commission to consider health and sanitation, but nothing in the regulations require that the prior hookup to a sewer system or state approval of the interim plan for sewage removal be conditions precedent to the granting of a special permit. Although the Commission was required to follow its own regulations in considering the application, a special permit procedure is not purely ministerial. The Commission was allowed to use its discretion within prescribed limits. Irwin v. Planning Zoning Commission, 244 Conn. 619, CT Page 877 626-27 (1998). In Styles v. Town Counsel, 159 Conn. 212 (1970), the court addressed this situation where a planning and zoning commission approved an application which, for its implementation, required the approval of other agencies over which it had no control. That case involved a change of zone and the court stated, "A change of zone which is dependent for its proper function or action by other agencies and over which the zoning commission has no control cannot be sustained unless . . . the necessary action appears to be a probability. Id. 221. See also Lurie v. Planning Zoning Commission, 160 Conn. 295 (1971).
There was substantial evidence in the record that the sewer line which Hendel planned to hook up to was planned and designed to accommodate development along Route 12 and that the town would accept the line so as to allow businesses, such as Hendel's, to hook up to it. The presence of the stub on the sewer line and the letter of the first selectman to the project manager dated January 2, 2001 confirm this.
The state public health regulations, in the record, indicate that holding tanks, such as proposed here, are authorized on an interim basis. A memo from Hendel's engineer dated October 25, 2001 to the town planner indicates that the use of a holding tank with a pumping plan would be adequate. There was no scientific evidence to counter this conclusion.
It must then be concluded that there is substantial evidence in the record that the premises for which the special permit was granted will be connected to the sewer line on Route 12 and that the use of the holding tank with pumping will be approved on an interim basis.
The situation where other permits are required after the granting of the special permit is not unusual. For example, a building permit will be required before construction. It is noted that even after approval of a special permit, § 11.5.4 requires action by the successful applicant within 90 days of such approval.
It must then be concluded that plaintiff has failed to prove that the Commission abused its discretion or acted illegally in violation of § 11.1.1 of the zoning regulations as alleged.
 II.
Plaintiff claims that the site plan submitted in connection with the special permit does not comply with the specific requirements of the applicable zoning regulations. Section 12 of the regulations covers site plans. Section 12.1 states, in part, that the site plan is intended to CT Page 878 provide the Commission with information necessary to determine that the proposed activity is in compliance with the applicable requirements of the regulations. The filing of a site plan, showing that the special permit use would be in conformance with the regulations, was required by § 12.2. In compliance with these regulations, a site plan was filed in connection with Hendel's application. It is plaintiffs claim that the site plan fails to comply with the zoning regulations in a number of ways.
The minimum requirements of the plan are delineated in § 10.16.1. Plaintiff contends that the plan approved by the Commission fails to meet these minimum requirements in that the plan does not provide the final seeding specifications for the stabilization of the property, the plan does not indicate the method by which implementation of the soil, erosion and sediment control plan will be verified by the municipality, no soil typing map (as required by § 10.16.1(b) of the zoning regulations) has been incorporated into the site plan and no estimate of the cost of implementing the soil erosion and sediment control plan has been provided in satisfaction of the requirements of § 10.16.5 of the regulations.
In connection with the claimed deficiencies in the application and the site plan, it is noted that these items do not represent a case of first impression to either the Commission or the town planner. The documents submitted were the result of prior rejection and resubmission in an effort to comply with the planner's concerns and the regulations themselves.
 a.
Section 10.16 of the regulations requires the filing of a Soil, Erosion and Sediment Control Plan. This section of the regulations provides what should be included in the plan. Plaintiff claims that the plans submitted do not provide for the final seeding specifications the stabilization of the project.
The regulations do not specifically cover final seedings. The drainage and grading detail sheet, a part of the package of plans submitted with the applications, addresses seeding of the property. Planning Note 1 on the plan requires that all disturbed areas not otherwise covered shall be landscaped or grassed. The note also covers loam, fertilizer, seeding and mulch. Erosion and sediment control notes on the same plan, 5 and 6, also cover seeding and when it should be planted. A review of the other plan submitted, particularly the landscaping plan, would also allow the Commission to determine which areas were to be planned with grass and when. CT Page 879
The plans submitted with the application contain a detailed soil and erosion control plan. Plaintiff claims that the application is deficient in that it fails to include how the implementation of the plan will be verified by the town.
While it is true that no specific schedule, or plan, for inspection by town officers has been submitted by the applicant, the detailed erosion and sediment control notes are shown on the plan. These notes, 1 through 16, set forth the schedule, what is to be done, how it is to be done, what should happen if certain things are not done on time and who is responsible for what. The municipal inspectors could easily use these notes to monitor to the project and schedule inspections. The evidence is clear that the town planner is thoroughly conversant with the project during the planning stage.
In evaluating the special permit application concerning municipal inspections, the Commission was endowed with liberal discretion whether or not the application complied with the regulations. Municipal Funding,LLC v. Zoning Board of Appeals, supra, 74 Conn. App. 161. It cannot be found that the Commission abused such discretion in regard to compliance with § 10.16.1a.5 involving town inspections.
 b.
Section 10.16.1b of the regulations requires the applicant for a special permit to file a map showing a number of things including soil types. Plaintiffs claims that Hendel's application fails to comply with this section of the regulations. The grading, drainage and erosion plan is a part of the package of maps filed with the application. This map shows the location of boundaries, existing and proposed topography with contour intervals at 20 feet to the inch, the proposed structure, (existing structure shown in demolition plan) and utilities. The designed details of all proposed soil, erosion and storm water management controls are also shown. All of these items are requited by Section 10.16.1b.
The plan does not show soil types except that it depicts the boundaries of the inland wetlands. The second paragraph of the project narrative, filed with the application, however, describes the existing conditions on the premises including the various soil types.
When the grading, drainage and erosion control plan is considered in connection with the other plans filed and the project narrative together with the testimony given at the public hearing, it must be concluded that there has been substantial compliance with the requirements of § CT Page 880 10.16.1b so as to acquaint the Commission with soil types and that it was well within the discretion allowed to the Commission to approve the application on that basis.
 c.
Section 10.16.5 of the regulations also requires the submission of an estimated cost of the measures to control erosion and sedimentation so that the town may establish a performance surety. Plaintiff alleges noncompliance with this requirement.
The record reflects that at the public hearing held November 7, 2001, Mr. Dewey, Hendel's project engineer, indicated that a cost estimate, which included soil and erosion control measures, had been submitted to the Commission. This detailed estimate was included with materials sent to the town planner on October 25, 2001. The document is in sufficient detail so that the Commission could easily determine the cost of erosion and sediment control. At the Commission's meeting held November 4, 2001, at which the special permit was approved, it was recommended that the applicant be required to post a $25,000 surety with $5,000 in cash to cover the cost associated with the construction in the event that the project was not to be completed in accordance with the plan and the Town was required to stabilize the site.
Considering all of these facts in the record and the logical inferences which the Commission could draw from such facts, it must be concluded that there is substantial evidence in the record to show compliance with § 10.16.5 of the regulations.
 III.
Section 12.6.5 of the regulations requires the Commission not to approve a site plan which poses a significant risk of degradation of surface or ground water supplies arising out of the proposed activity. This section provides as follows:
 12.6.5 Surface and Groundwater Protection. No site plan shall be approved which poses a significant risk of degradation of surface or ground water supplies arising from the proposed activity, the application shall include:
 a. Identification of surface and groundwater resources on and around the site, including any public or private domestic users of such water; the depth to groundwater and description of adjacent soils, and any other information necessary to ensure CT Page 881 protection of water resources.
 b. An evaluation of the impact of the proposal on existing and potential surface and ground drinking water supplies, to be prepared by a qualified hydrogeologist or other professional acceptable to the Commission.
 c. Identification of any chemicals or potential contaminants to be used, stored or produced on site or discharged on or off the site, and a detailed description of methods and procedures by which any chemicals or potential contaminants on site will be stored, used, applied, discharged and disposed of.
Plaintiff claims that the application now in dispute fails to comply with this section, particularly with subparagraphs a, b and c. It is plaintiffs position that since the application failed to comply with § 12.6.5, the Commission abused its discretion in approving the plan.
A review of the record indicates that there was considerable information concerning surface or groundwater activity in connection with the proposed project. The record indicates that in November of 2000, the site plans for this project were reviewed by the Conservation Commission. By letter dated December 12, 2000, the Commission advised Hendel's engineer that no formal application for regulated activity would be necessary. The Commission indicated that erosion control methods were in place and that all work would be taking place well outside of the 50-foot setback area. Presumably, the 50-foot area would be between the project and the wetlands. The Commission made a suggestion, however, as to the modification of catch basins to be installed on the project. This was done.
The project narrative, filed with the application, indicates the current storm water runoff situation. It was stated that westerly runoff would not be significantly affected by the proposed site improvements. The easterly flow to the wetlands would be increased. Attached to the narrative were details concerning the peak runoff flow rate to the wetlands to both the east and west of the property.
The project narrative stated that all proposed construction activities would be in excess of 60 feet from the wetlands and the wetlands adjacent to the site would be protected from construction activities by an aggressive erosion and sediment control program. Data concerning increased runoff was included. Storm water runoff to the west would be collected in a combination of new and existing storm drain systems. Since CT Page 882 there would be no significant change in this runoff, the system would be ample. The easterly runoff which flows towards the wetlands would be collected in a new drainage system consisting of two precast concrete catch basins and a manhole. The catch basins were to have two-foot sumps to capture sand, sediment and debris. Also, all new catch basins were to have a hooded outlet located internally to provide oil and water separation. The engineer stated that the proposed piping system provided more than ample capacity to handle the peak flow rate from a 25-year storm. Data supporting this statement was included.
The narrative also included a five-paragraph section covering impact avoidance and maintenance indicating how the impact of the proposed project on adjacent properties and wetlands would be handled. The maps filed in connection with the application showed the location of the wetlands and indicated a 50-foot setback line. No construction or grading was indicated within this line. The plan entitled "Drainage and Grading Detail Sheet" included the detailed erosion and sediment control notes which have previously been reviewed. This plan also included details as to the piping, as well as cross sections of the catch basins and other drainage features.
In addition to the narrative, the maps and plans and the notes on the plans potential contamination problems were addressed by Hendel's witnesses at the public hearing held November 7, 2001. The double wall tank system was explained along with the piping. The system design to monitor possible tank leaks and to sound a warning in the event of such leak was described. The system for handling possible contamination by petroleum products at the pumps was explained and questions by members of the Commission were answered. The protection of water resources in the area of the project did not appear to be a significant issue. The record indicates that public water was available in the area through the Jewett City Water Co. By its letter of March 15, 2000, this company agreed to supply water to the site.
There was no scientific evidence or expert testimony in the record to show that the surface and ground water protection plans and procedures submitted by the applicant would not be adequate.
A review of the record necessarily leads to the conclusion that there was substantial evidence of compliance with the provisions of § 12.6.5 and that the Commission did not abuse its discretion in approving the application as claimed by plaintiff.
 IV. CT Page 883
Considering all of the substantial evidence in the record relevant to the issues, it is found that in approving the special permit at issue here, the Commission's action was not unreasonable, arbitrary or illegal, and the decision must be upheld.
 ___________________ Joseph J. Purtill Judge Trial Referee
CT Page 884